## SEBASTIANO GALLIANO v. LEON PIERRE & Co.

As a general rule, the validity and effect of a contract are to be determined by the law of the place where it was made; if it is valid there, it is, under the general law of nations, valid everywhere, by the implied consent of the parties. But the rule is subject to the exception, that no nation is bound to recognize or enforce contracts injurious to its own citizens or subjects; and the enforcement, by one nation, of contracts made under the laws of another, rests on a principle of comity, which cannot be so far extended as to violate the positive legislation of the other.

The legal damages for a failure to pay a stipulated amount in gold cannot possibly exceed that amount in any lawful currency.

APPEAL from the Sixth District Court of New Orleans, *Howell*, J. *Durant & Hornor, for plaintiff and appellant.*—Petitioner sues on a charter party and bills of lading for the payment of freight and damages *in gold*, for the carrying of certain goods from Havana to New Orleans, $2,199 44.

Defendants except to the captain appearing in this suit, pray over of his authority, and the names of his owners.

This exception was overruled, and we think rightly. L. C. 3213.

The answer is a general denial. Judgment was rendered for $1,399 44, interest and costs, virtually, payable in current funds; and from this judgment, after a labored effort to obtain a new trial, the plaintiff has appealed.

The charter party is dated at Havana, 30th July, 1862. The parties to it are Galliano (the plaintiff) and Don Luis Petit. The important part of the contract reads as follows:

"On the faithful delivery of the cargo, the consignor promises to order payment of the freight in cash and without discount *en efectivo* (in hard money, real money, coined money, gold or Spanish milled dollars—not paper money,) in the port of discharge, at the rate of, etc., etc."

The sole point in the case is, shall we be paid in gold? Or shall this contract, made in Havana, and a law between the parties, be satisfied and paid, after the services have been rendered, by a few old rags and a little printer's ink? The very statement of the proposition displays its absurdity.

Let us look at the reasons urged by the lower Judge for denying us the prayer of our petition. They are three in number.

First—The charter party is not shown to have been made in behalf of defendants, nor knowledge thereof brought home to them prior to the institution of the suit; they are bound only by the bills of lading, which do not contain the stipulation to pay freight cash without discount *en efectivo;* and the evidence shows that when consignees are to pay the freight in specie, it is so stipulated in express terms in the bill of lading.

The fact that the charter party and the bills of lading are connected and form one and the same transaction, results from the signature of Luis Petit to each one of the ship's bills of lading, signed by him as charterer, "*como cargador.*" This proof is conclusive. "The charter party is the contract for the hire of the ship, and the bill of lading for the conveyance of the cargo. Kent, *207.

"The terms of hiring a ship are almost always confounded with the terms of carrying the goods, because the captain, who charters his ship as representing the owner, binds himself personally, at the same time, to take care of, during the voyage, and to deliver at the time and place agreed on, the goods in his charge. From this it generally results that instead of making a charter party, whose object is to prove that *such a person* has acquired the right of occupying the whole or only a portion of a ship, and then a bill of lading for the purpose of proving that such goods have been sent on board in conformity to the original contract, people generally content themselves with a bill of lading, which implicitly takes for granted and contains the first contract, just as every effect proves a cause. Besides, when the lading is done by the owner, it is impossible to have a charter party, since the owner cannot be the hirer of his own thing." 3d Pardessus, 163; 2d Boulay Paty, 300.

Nothing can be clearer than this. The charter party is the cause, the bill of lading the effect. It is similar to the case of a sum of money borrowed on mortgage, when notes are given for the re-payment of the loan. The act is the cause, the notes are the effect. To give the notes their legal operation can only be done by reference to the act. In the present case, should there be any discordance between the charter party and bills of lading, the cause must govern the effect.

The fact that the bills of lading held by the defendants do not contain the words, "Luis Petit, *como cargador,*" is readily explained, and is the natural result of the universal usage on this subject.

Kent says (3d vol. *207): "There are commonly three bills of lading; one for the freighter, another for the consignee, factor or agent abroad, and a third is usually kept by the master for his own use." The bill of lading retained by the ship is never signed by the captain, for it is a useless formality. He retains it for his own convenience, and if needful he may sign it at any time.

In precisely the same way, Luis Petit "*como cargador*" places his signa-

ture to the ship's bill of lading; but it is, with him, a vain formality to affix it to the bills of lading he retains. It is thus seen that this fact that the ship's bills of lading are signed by the charterer and not by the captain, and that defendant's bills of lading are signed by the captain and not the charterer, is of no importance whatever in the decision of the case. The ship's bills of lading are signed by the charterer, and the charter party is unquestionably the contract of the parties. The bills of lading are only collateral. 1st Bell's Commentaries, 542; Abbott on Shipping, *278, 321.

And if there be a difference between the charter party and the bills of lading, the former governs the latter. Flanders on Shipping, 515; Abbott on Shipping, *278; Chitty on Carriers, *150.

It is altogether inconsistent with the regularity of judicial proceedings, to permit a solemn contract in writing to be overthrown by vague evidence of an uncertain usage.

The next ground taken by the Court below is: "The charterer bound himself and not the defendants, in the charter party."

This admits virtually our whole case. The bills of lading are identified with the charter party by the signature of Luis Petit "*como cargador.*" The goods set forth in the bills of lading are the goods described in the charter party. The rate of freight is the same, except that the charter calls for payment *en efectivo* and the charterer bound himself to pay *en efectivo* by the charter party.

The consignee is bound whether he acts in the capacity of principal or of agent. In either case, he is bound by the charter party; for it is his own act, or the act of his agent, for which he is liable.

It is not contended that defendants have not received the goods, nor do they refuse to pay for the freight. The mere receipt of the goods makes them liable for the freight. By this act they obtained possession as owners. They never gave up their principal's name. We are entirely at a loss to know how they can be permitted to satisfy their obligation by a payment "in current funds"—a term unknown to the laws of our country, vague and uncertain in its meaning, and destructive to all fair commerce.

The contract was made in Havana, where the currency was Spanish, Mexican and South American gold and silver. The printed part of the charter party which reads "*al cambio corriente sobre Londres*" was stricken out, because the contract was that the freight should be paid in specie, etc., etc. He is as clear as the sun at noonday in his deposition ; and gives the law as well as the facts of the case, like an intelligent, upright business man. Compare his testimony with that of Luis Petit !

But the clause "he or they paying freight" was inserted for the express benefit of the ship owners. *Sheppard* v. *De Bemales,* 15 East. 565. . Why should it be so construed as to work them an irreparable injury ?

*Michael Hahn and J. Magne, for defendants.*—The defendants, who have

always been ready to pay in currency, deny to have ever contracted to pay otherwise, as shown by the bills of lading which are their only contract ; and deny having any thing to do with the charter party, which is, as to them, res inter alios acta. The judgment of the District Court was in favor of the defendants and the plaintiff has appealed.

I.—There is nothing in the record connecting, in any way, the defendants with the charter party : and this is conclusive.

But, says plaintiff : Petit, the charterer in Havana, signed my bill of lading *como cargador* (meaning as shipper,) and this fact is a sufficient link. We humbly think that it is no link at all. The chartering of a vessel is a commercial speculation of daily occurrence. The charterer expects to receive from the shippers or consignees a higher freight than the one he pays to the ship owner ; if he succeeds, he is a winner, if not he loses his expected profit ; and when he ships goods to his correspondents by the ship he has thus chartered he is merely, as to them, a shipper; and the consignees of the goods have obviously nothing to do with him but to pay the freight of the goods as per bill of lading ; and whenever the charterer acts for the account of the consignee, he states in the bills of lading that "the freight is to be paid as per charter party." *Ruggles* v. *Buckner*, 1 Paine C. C. Rep. 359. Certain lots of mahogany, 2 Sumner C. C. Rep. 590, 604. All this is notorious, agreeable to law, commercial usage and common sense. Whilst, according to the plaintiff's opinion, all the consignees of goods should be bound by a charter party to which they were not parties, and the very existence of which is unknown to them : a doctrine which is clearly unsound and untenable.

It is here to be observed that art. 800 of the Spanish *Codigo de Comercio*, which is in force in Havana, requires the shipper to sign one bill of lading to be delivered to the master, and requires the master to sign as many as are required by the shipper : El cargador firmarà un conocimento que entregarà al capitan ; el capitan firmarà tantos quantos exije el cargador. Cod. de. Com., art. 800. Hence we see that the bills of lading offered in evidence by the plaintiff are signed by the shipper, p. 5 to 6 ; and those offered by the defendants, p. 47 to 59, are signed by the master.

And the plaintiff himself was so well aware of the absolute want of connexion between the charterer Petit and the defendants that he asked from one of his witnesses in Havana, *Cejas*, p. 37, "what were the legal relations between Petit and the defendants? or whether Petit was the agent of the defendants ?" to which the witness answered : "that he knew nothing about it "—and Cejas was the ship broker who negotiated the charter party between Petit and the plaintiff, and who signed it as a witness.

II.—Being only bound by our bills of lading, which stipulate that the consignees shall pay so many dollars and cents for the freight of the goods delivered to them, it is obvious that we are bound to pay in the legal cur-

rency of the country—nothing more—and this we have offered to do, both before and after the institution of the suit.

It is shown that other consignees of goods, received by the same ship, and whose bills of lading were of the same tenor as our own, paid their freight in currency without objection on the part of plaintiff.

It is shown also that whenever the master intends to receive his freight in gold, in this country, for goods shipped in Havana, he stipulates in the bill of lading: "payable in American gold." Hence the irresistible inference is that, in this case, the master had intended to be paid for his freight in currency.

ILSLEY, J. The present action was instituted by the master of the Sardinian brig Nuestra Senora Del Buen Camino, against the defendants, to recover from them, in *gold*, either coined or native, the sum of thirteen hundred and ninety-nine dollars and forty-four cents, for freight of certain merchandize, shipped in the port of Havana, on the said brig, by one Louis Petit, the charterer thereof, and consigned to the defendants in New Orleans.

The plaintiff also claims the additional sum of eight hundred dollars in *gold*, being the stipulated penalty for non-compliance with the contract of charter party, and interest thereon from the 20th October, 1862, with special privilege on the property sequestered.

The defendant excepted to the plaintiff's right of action for want of alleged interest in the claim sued for, and because he is not the agent of the owners of the brig, and has no authority or power to prosecute the suit, and has not given the names of his constituents, the real plaintiffs in interest, as such. This exception was overruled by the Court below, but, as our attention is not specially called to the exception, we presume it is waived.

No objection is made to the plaintiff's claim for freight, as to amount, but the defendants contend that they are only bound by the bills of lading, and not by the charter party; and that what they do owe, is only exigible in the national currency of the United States (treasury notes), which they have offered to pay.

This case must be goverened by the law of Louisiana, for, although the contract of affreightment was entered into in Havana, it was, by its terms, to be executed here. See the case of *Beirne* v. *Patton*, 16 L. 589.

As a general rule, the validity and effect of a contract are to be determined by the law of the place where it was made; if it is valid there, it is, under the general law of nations, valid everywhere, by the implied consent of the parties. C. C. 10; *Groves et al* v. *Nutt and wife*, 13 A. 117.

But the rule is subject to the exception that no nation is bound to recognize or enforce contracts injurious to its own citizens or subjects; and the enforcement, by one nation, of contracts made under the laws of another, rests on a principle of comity, which cannot be so far extended.

as to violate the positive legislation of the former.   *Mary* v. *Brown*, 5 A. 269.

Viewed, then, as a local contract, it is, we think, immaterial whether the defendants' obligation is to be controlled by the charter party or by the bills of lading.   Whether by agreement it is to be satisfied in one species of currency or in another, it is sufficient reason for courts which recognize the laws of the United States as paramount, to refrain from specifying, in their judgments, in what particular kind of currency moneyed obligations are to be satisfied.

United States treasury notes, by the act of Congress of 25th February, 1862, are not only made money, but they are a lawful tender for all species of debts, private as well as public, with some exceptions in the latter; and, were courts to decide that nothing but one kind of currency, whether metallic or paper, should be received in satisfaction of their judgments, they would thus, by sustaining agreements to that effect, over-ride and disregard the very letter of the law.

In some of our sister States, the question now under investigation is no longer an open one, either as to the constitutionality of the law above referred to, which we shall not question, or to the practical operation of the legal tender act.

In the Supreme Court of Michigan, in the case of *Buchegger* v. *Schultz*, very lately decided and not yet reported, the whole subject involved in the present inquiry underwent a very careful and critical examination; and, as the view we entertain is therein upheld with great clearness and logical accuracy, we refer to it, as an exposition of the law, applicable to the present case.

The action alluded to was on a note given in 1862, for the sum of eight hundred dollars, of which, five hundred were to be paid in gold.   The contract was proved, as also the fact that, at the time of the trial, gold was worth a premium of fifty per cent. in treasury legal tender notes; and judgment was rendered by the Circuit Judge against the defendant, computed upon that basis.

The ruling of the Supreme Court, on the appeal, was to the following effect:

1. That a contract for a certain number of "*dollars*," though stipulated to be paid in gold, is not a contract for gold as bullion or merchandize, but as money, and, therefore, payable in any lawful money.

2. The acts of Congress, called the legal tender acts, do not merely confer a privilege on debtors for their benefit, but are measures of public policy, and the right under them to pay in any lawful money, cannot be waived, even by express consent.

3. The measure of damages for non-performance to pay money, is the number of legal dollars, without regard to the stipulations, as to the kind of money by which the contract is to be discharged.

The correctness of the conclusion reached by the Court, that a contract for a delivery of so much gold in bullion, or by the ounce, or other quan-

Sebastiano Galliano v. Leon Pierre & Co.

tity, must not be confounded with one for the payment of so many *dollars* in coin from that metal, is so palpably evident as to need no argument to support it, and it is, therefore, needless for us to dwell longer on this point.

In support of the doctrine taught in the second point, the Court remarks :

Before the passage of the legal tender act, all contracts for the payment of dollars generally were payable in gold and silver; because, by the statutes then in force, coin from those metals could alone be lawfully tendered in payment; and, as parties are supposed to make their contracts in reference to the existing law, all prior contracts were to be construed precisely as if the words "payable in gold and silver coin" were incorporated therein.

And, if all such contracts may now be discharged by legal tender notes to the specific amount, we are unable to see why a contract which includes this stipulation in its terms is not subject to be discharged in the same way. The rules which govern this case seem, to us, few and simple. If legal tender laws were designed chiefly to confer upon debtors a privilege, there would be force in an argument that the class to be benefitted might waive the privilege of stipulation in their contracts. But these laws are also based in a great measure upon reasons of State policy, which, sometimes, to a considerable degree, control and disregard individual interest.

The act in question was based exclusively upon reasons of a public character, which, in the opinion of the law-making power, imperatively demanded that treasury notes should be made equal in legal value to coin ; and parties have no more right to stipulate that their contracts shall not be governed by it, than those of a particular locality have to agree among themselves, that this or any other law, passed by the competent authority, shall not be in force in such locality.

What shall constitute a dollar in money is fixed by the national law, which, as respects the subject, is supreme.

The legal tender act not only made treasury notes money, but it made them a lawful tender for all private as well as most public dues. In doing so, it made these notes the legal equivalent for gold and silver coin to the same nominal amount. It is true that, at the stock boards, a difference is recognized, and that the holder of the coin may command a premium for it in notes; but this fact has no bearing upon the question when presented to the Courts, which must be governed by the law, if it has been enacted by competent authority. Moreover, gold and silver coin are seldom of equal value at the stock boards ; and, it is impossible for any law fixing a like legal value upon several species of money, to prevent fluctuations in their relative market values, caused by circumstances which no legislation can control. But these circumstances do not authorize the courts to recognize a distinction between gold and silver, or gold and treasury notes, when the paramount authority has declared that their legal value shall be the same.

The Courts have no power to render a judgment payable in one species of money only, and, therefore, a judgment rendered upon a note, payable in gold, cannot be made payable in gold only, but must be for the payment of so many dollars, without specifying the kind.

But, if it be for the payment of dollars generally, then it can be rendered only for the number of dollars mentioned in the note, and interest thereon; since one dollar is legally just as valuable as any other dollar.

The legal damages for a failure to pay a stipulated amount in *gold*, cannot possibly exceed that amount in any lawful currency; and, when a Court renders judgment for any greater damages, upon such a contract, it sets aside and disregards the legal tender act altogether.

It is unnecessary to determine how such a stipulation, if made in a contract having a date anterior to that of the legal tender act, would be affected by that act; and whether it were competent for Congress to pass a law which would violate the obligation of a contract. It suffices, in this case, that the contract was passed whilst the statute alluded to was in force; and, to give it the effect claimed for it by the plaintiff, would virtually be to make the law yield to the contract, and not the contract to the law.

For reasons, different from those assigned by the Judge of the lower Court, we affirm the judgment rendered by him.

It is therefore ordered, adjudged and decreed, that the judgment of the lower Court be affirmed, and that the plaintiff and appellant pay the costs of appeal.

